**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL NERO** | : | |
| | : | **CIVIL ACTION** |
| v. | : | No. 24-5974 |
| | : | |
| **WHITPAIN TOWNSHIP,** *et al.* | : | |

**McHUGH, J.**                                                                               **January 20, 2026**

**MEMORANDUM**

  Plaintiff Michael Nero claims a violation of his Fourth Amendment right to be free from excessive force arising out of a police officer's use of handcuffs during his arrest for driving under the influence of alcohol. Specifically, Plaintiff alleges the officer ignored his complaints of numbness and pain in his hand and refused to adjust the handcuffs when there was a reasonable opportunity to do so, resulting in a serious wrist injury. There is contemporaneous body camera footage confirming proper procedure on the officers' part when the handcuffs were first employed.

  As events progressed, there are some factual disputes between the parties, but no dispute that Plaintiff first complained about the handcuffs as the officer was transporting him a short distance to the hospital for a blood test. Given the brief window of time during which the officer might be faulted for failing to adjust the handcuffs, and the fact that Plaintiff had a history of nerve impingement for which he previously required wrist surgery, a jury could not on its own reasonably attribute the injury claimed to overly tight handcuffs. Without support from a medical expert, Plaintiff cannot prove injury even if he could prove the use of excessive force,[1] with the result being that Defendants' Motion for Summary Judgment must be granted.

---

[1] The arresting officer has been dismissed by stipulation, and as to the officer who transported Plaintiff to the hospital, Defendant Officer Justin Gannon, the sole theory alleged is that he should have stopped the

I.      **Relevant Facts**

On November 24, 2022, at around 2:25 a.m., Whitpain Township police officers responded to a call regarding an intoxicated driver passed out at the steering wheel. *See* Dispatch Event Register at 2, ECF 20-4. Officer Francis Rippert arrived first on scene and found Plaintiff Michael Nero's car stopped, over the curb, and in the southbound shoulder facing north. Rippert Body Worn Camera (BWC) at 00:14, ECF 20-7. After removing Plaintiff from the car, Rippert's body camera captured Plaintiff failing field sobriety tests, slurring his speech, and using profanity. *See generally id.* Rippert arrested Plaintiff under suspicion of driving under the influence of alcohol (DUI). BWC at 16:48; Dispatch Event Register at 2. Before double-locking the handcuffs on Plaintiff's wrists, Rippert first asked him, "Are they too tight?" and then inquired, "Are the handcuffs too tight or anything?" to which Plaintiff responded by shrugging his shoulders and mumbling, "Whatever." BWC at 17:18-25. Thereafter, Plaintiff was secured in the backseat of Defendant Officer Justin Gannon's police vehicle, who arrived on scene shortly after Rippert. Gannon Dep. at 20:14-24, 21:16-23, ECF 20-8. Plaintiff did not complain about the handcuffs at that time.

Gannon then read Plaintiff a form that the Pennsylvania Department of Transportation (PennDOT) requires officers to read to an individual arrested on suspicion of DUI before asking that individual to submit to a chemical blood test. *Id.* at 22:12-17. Around that time, Officer Anthony Garced arrived on scene. BWC at 34:52. With Plaintiff secured in the backseat, Gannon departed the scene enroute to the hospital where the blood test would occur while Garced followed

---

police cruiser he was driving to adjust the handcuffs before continuing to the hospital. Aside from defending his decision as reasonable, Officer Gannon asserts qualified immunity.

in a separate police vehicle. *Id.* at 43:17. Before the officers transported Plaintiff to the hospital, however, they stopped at the police station to confirm they read the most updated PennDOT form to Plaintiff.[2]  Gannon Dep. at 22:17-23:4, 24:1-6.  Gannon estimated the drive from the scene to the station took about five minutes because there was no traffic on the road at that time of night. *Id.* at 35:4-14.

There is no body camera footage except for the events at the scene.[3]  Gannon testified that during the brief drive to the station, Plaintiff berated Gannon for arresting him, demanding release. *Id.* at 23:11-21, 37:22-38:4.  This testimony is consistent with the on-scene footage, as Plaintiff began insulting the officers as he was being placed in the police cruiser.  BWC at 20:50. Gannon estimated it took about five minutes to confirm the form's accuracy at the station, during which time Plaintiff did not complain about the handcuffs. *Id.* at 36:8-18.  Plaintiff does not recall a stop at the station, but his testimony about when he first complained comports with Gannon's – that it occurred on the way to the hospital.  Nero Dep. at 81:9-13, 108:13-15, ECF 25-7; Gannon Dep. at 41:5-11.  There is a dispute as to how vociferously Plaintiff complained.  Gannon testified that

---

[2] Plaintiff correctly identifies an inconsistency between Gannon's and Garced's testimony as to which officer went inside the station to verify the form, Opp. to Mot. for Summary J. at 6, ECF 25, however, that fact is immaterial to resolving this motion.

[3] Whitpain Township Police Department has a two-year retention policy for videos of DUI arrests.  ECF 26-2 at 2.  It represents that it did not receive notice of suit or a preservation letter from Plaintiff until December 26, 2024, more than two years after the arrest. ECF 26 at 8; ECF 26-1 at 2.  As a result, Gannon's and Garced's BWC videos were automatically purged in line with the policy.  Rippert's BWC footage was available only because the Montgomery County District Attorney's Office timely requested a copy of it in connection with the Office's criminal DUI prosecution of Plaintiff. ECF 26 at 8.  Plaintiff argues spoliation but has not provided any reason to doubt the Department's explanation for why more footage did not survive, and his own expert on police procedure testified that having such a policy is standard practice. Garrels Dep. at 27:1-19, ECF 29-1.  The docket is consistent with the Department's representations in that the first entry of an appearance for the defense was on January 13, 2025, and there is no certification of service earlier.

Plaintiff only complained about numbness in his right hand, while Plaintiff insisted that he complained multiple times about feeling "sharp radiating pain" in his hand and numbness in his fingers. Gannon Dep. at 41:5-11; Nero Dep. at 62:17-24.

Regardless, Gannon informed Plaintiff that they were proceeding to the hospital where Gannon would remove the handcuffs and medical staff could evaluate Plaintiff for any injuries. Gannon Dep. at 24:10-16, 58:8-13; Nero Dep. at 62:21-25. According to Gannon, Plaintiff then demanded that Gannon pull the vehicle over and release him. Gannon Dep. at 24:17-22, 58:23-59:2. Gannon estimated it took less than ten minutes to drive from the station to the hospital. *Id.* at 37:5-10, 41:19-23. This is consistent with the opinion of Plaintiff's expert on police procedure, who estimated a travel time of ten minutes, depending on traffic, Pl.'s Expert Report, ECF 25-6 at 27, and it was approximately 3 a.m. when the transport occurred.

Nothing physically prevented Gannon from stopping the vehicle on the side of the road or returning to the station and adjusting Plaintiff's handcuffs at that time, but based on his training and experience, he testified that it was safer under the circumstances to do so at the hospital. Gannon Dep. at 45:8-13. According to Gannon, Plaintiff's intoxication, belligerence, and screaming supported his decision as did the risks of encountering other drunk drivers on the road and Plaintiff becoming violent with the officers if they removed his handcuffs. *Id.* at 42:7-13, 42:21-43:9, 44:20-23. Gannon also believed the hospital was the better location because Plaintiff could be secluded in a controlled environment and medically evaluated at the same time. *Id.* at 44:4-11, 45:19-46:23.[4]

---

[4] Plaintiff understandably questions why a hospital would be more secure than a police station. The defense responds by citing Defendant Police Chief Kenneth Lawson's testimony, explaining that as a small

When they arrived at the hospital, the officers secured Plaintiff in a triage room and removed his handcuffs so medical professionals could draw his blood and evaluate him. *Id.* at 24:23-25:11, 53:17-20; Nero Dep. at 97:23-98:3. The evaluating physician, who noted that Plaintiff was "[irate] and [could] not be reasoned with," ECF 20-13 at 3, recorded several observations of critical importance. Notes of the examination showed that Plaintiff had normal flexion and extension of his wrist, grip strength, and range of motion; no obvious trauma or signs of injury; no fractures; and no abrasions (scrapes) or ecchymosis (bruising) on his wrist or hand. *Id.* at 3-4; ECF 25-10 at 239. X-rays were negative except for a possible degenerative change on one bone of the hand. ECF 20-13 at 4; ECF 25-10 at 141.

Although Plaintiff had some tenderness in his wrist, the physician determined that his "symptoms [were] likely due to ulnar nerve compression given the distribution of the paresthesias" in two digits of his hand, noting that he has a history of paresthesias and carpal tunnel syndrome for which he previously underwent surgery. ECF 20-13 at 4. In sum, there were no signs of traumatic injury, no traumatic injury was diagnosed, and Plaintiff's symptoms were attributed to a prior medical condition. Just over one month later, on December 27, 2022, Plaintiff underwent surgery to address carpal tunnel syndrome and ulnar nerve compression in his right wrist. ECF 25-10 at 21-22; ECF 20-13 at 6-7. Importantly, none of the records surrounding the surgery attributed Plaintiff's condition to trauma. Plaintiff has not identified any medical expert and relies exclusively on the fact that he underwent surgery to address carpal tunnel syndrome within weeks of his arrest. ECF 25 at 19.

---

department, Whitpain may only have a dispatcher at the station in the middle of the night. Lawson Dep. at 16:5-20, ECF 20-11.

II.  **Standard of Review**

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

III. **Discussion**

   A. **Plaintiff cannot demonstrate one of the essential elements of his Fourth Amendment claim – the occurrence of an injury.**

A cause of action under 42 U.S.C. § 1983 arises when a police officer uses force so excessive that it violates the Fourth Amendment. *Williams v. City of York, Pa.*, 967 F.3d 252, 259 (3d Cir. 2020). With respect to a claim arising out of the use of handcuffs, the parties agree that under controlling Third Circuit precedent, "a successful claim requires that [1] a plaintiff explicitly complain about the tightness, [2] the officer ignored or refused the complaints, and [3] the plaintiff must have evidence of injury." *Lugo v. DeAngelo*, No. 19-cv-1442, 2021 WL 4477448, at *3 (E.D. Pa. Sept. 30, 2021) (Sánchez, C.J.) (citing *Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005)). Plaintiff cannot satisfy the third element.

As noted in the recitation of the record above, on the night of Plaintiff's arrest, there was no physical evidence of a traumatic injury whatsoever – not even redness where the handcuffs would have secured his wrists. The physical examination was negative, except for minor paresthesia the examining physician attributed to Plaintiff's history of carpal tunnel syndrome. Some conditions are considered pathognomonic, such as mesothelioma being a hallmark sign of asbestos exposure. But that is hardly the case with the use of handcuffs and ulnar nerve

6

compression, which can have multiple causes, one of the most common being the condition with which Plaintiff was previously diagnosed.[5]

Federal courts often look to state law principles when applying section 1983, *Wallace v. Kato*, 549 U.S. 384, 387 (2007), and Plaintiff seemingly seeks to invoke some form of *res ipsa loquitur* as his means of establishing injury. Pennsylvania law allows medical causation to be proven in that way, but only where causes other than the defendant's conduct can definitively be ruled out. *See, e.g.*, *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140 (Pa. 2003); *Gallegor v. Felder*, 478 A.2d 34 (Pa. Super. Ct. 1984). That is hardly the case here, where the physician who examined Plaintiff in response to his complaints viewed his preexisting carpal tunnel syndrome as the presumptive cause of his distress, not his having been handcuffed. And although Plaintiff's liability expert focuses on the entire period he was handcuffed, from the standpoint of causation, the relevant time to be considered is the far shorter interval after Plaintiff first complained. I perceive no basis on which a lay jury could address the physiological effect of that additional time in restraints without expert medical testimony. *Compare Graham-Smith v. City of Wilkes-Barre*, No. 14-cv-2159, 2017 WL 1386232, at *5 (M.D. Pa. Apr. 18, 2017) (granting summary judgment where the plaintiff did not establish medical causation), *with Fry v. Smoker*, No. 11-cv-3015, 2012 WL 1622656, at *7 (E.D. Pa. May 9, 2012) (denying summary judgment where the plaintiff produced substantial evidence of serious injuries from too-tight handcuffs requiring six months of treatment and an expert report establishing medical causation).

---

[5] The ulnar nerve is not even the site where it can necessarily be said a compression injury from handcuffs would most likely occur. A retrospective study of nerve injuries attributed to handcuffs concluded that the median nerve is the site of compression in 82 percent of the cases. *See* Shawn Khan et al., *Hand and Wrist Injuries Associated with Application of Physical Restraints: A Systematic Review*, 18 HAND 1253–1257 (2023).

What remains of any potential injury claim is Plaintiff's discomfort while he remained handcuffed after complaining. Handcuffs represent the application of force, one which puts the person detained in an unnatural and physically uncomfortable position. But only excessive force is unlawful. Recognizing this, as the Tenth Circuit has noted, "[a] number of circuits . . . have adopted some form of a non-de minimis injury requirement in excessive force handcuffing cases." *Fisher v. City of Las Cruces*, 584 F.3d 888, 898 (10th Cir. 2009) (citing *Freeman v. Gore*, 483 F.3d 404, 416-17 (5th Cir. 2007) ("[M]inor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."); *Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005) (explaining that to reach a jury on a handcuffing claim, "the plaintiff must allege some physical injury from the handcuffing"); *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005) ("Although we no longer require 'significant injury' for excessive force claims . . . the injury must be more than de minimis.")).

The Third Circuit does not appear to have set a threshold, but these decisions are sensible and consistent with the Pennsylvania Supreme Court's observation that damages need not be awarded for situations that represent the "transient rub of life and living." *Boggavarapu v. Ponist*, 542 A.2d 516, 518 (Pa. 1988). Wherever that line should ultimately be drawn, in this case, with no physical manifestation of any injury whatsoever that Plaintiff can link to the use of handcuffs, and no questions that restraint was warranted, I can discern no basis for claiming a

deprivation of the right to be free from excessive force. Defendants are therefore entitled to summary judgment on the Fourth Amendment excessive force claim.[6]

### B. Plaintiff's remaining claims also cannot survive summary judgment.

Because I conclude that Plaintiff's excessive force claim fails as a matter of law, his remaining claims also fail.

#### 1. Monell – Failure to Train

Regarding his *Monell* claim against Whitpain Township and Chief Lawson, municipal liability may arise only if an underlying constitutional violation occurred.[7] *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *see Harris v. Krasner*, 110 F.4th 192, 198 (3d Cir. 2024) ("[F]or *Monell* liability to attach, there must still be a violation of the plaintiff's constitutional rights.") (citation omitted); *see, e.g.*, *Telepo v. Palmer Twp.*, 40 F. Supp. 2d 596, 612 (E.D. Pa. 1999), *aff'd*, 242 F.3d 371 (3d Cir. 2000) ("The Court having found that there was no constitutional violation committed by the underlying officers, supervisory liability cannot be

---

[6] Because I conclude that Gannon is entitled to summary judgment on Plaintiff's excessive force claim, I need not address whether he is entitled to qualified immunity. *See Torres v. McLaughlin*, 163 F.3d 169, 174-75 (3d Cir. 1998).

[7] The Third Circuit created an exception to this rule for substantive due process claims brought under the Fourteenth Amendment. *See Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) ("We hold that in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution."); *Brown v. Commw. of Pa., Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) ("It is possible for a municipality to be held independently liable for a substantive due process violation even when none of its individual employees is liable."). But even in those cases, "for *Monell* liability to attach, there must still be a violation of the plaintiff's constitutional rights." *Johnson v. City of Phila.*, 975 F.3d 394, 403 n.13 (3d Cir. 2020) (citation omitted).

imposed upon Chief Fretz for an alleged failure to train and supervise."). Here, there was no underlying violation, so *Monell* liability does not attach to Whitpain Township or Chief Lawson.[8]

Even assuming Gannon had committed a constitutional violation, Plaintiff cannot state a cognizable failure-to-train claim against Whitpain Township or Chief Lawson. To do so, Plaintiff must "identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004); *accord City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). This usually requires demonstrating a pattern of underlying constitutional violations, although it is possible, but difficult, to do so in the absence of such a pattern. *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Plaintiff must also prove the municipal policy or custom directly caused the alleged constitutional violation. *City of Canton*, 489 U.S. at 385 ("[T]the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."); *see Grazier v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) ("[M]unicipal liability will only lie where municipal action actually caused an injury.").

Discovery revealed that the Whitpain Township Police Department had policies in place during the relevant period regarding the use of force, handcuffing and restraints, medical aid and

---

[8] Because Plaintiff sues Chief Lawson in his official capacity, the *Monell* claim against him duplicates the *Monell* claim against Whitpain Township and therefore fails for the same threshold reason. *See Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990) ("In determining whether plaintiffs sued Hafer in her personal capacity, official capacity, or both, we first look to the complaints and the course of proceedings.") (internal quotation marks and citation omitted); Compl. ¶¶ 51-62, ECF 1 (seeking non-monetary relief against the municipal defendants); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that an official-capacity suit functions as a suit against the municipality); *Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985) (explaining that the Eleventh Amendment permits official-capacity suits that seek only injunctive, not monetary, relief from state officials).

response, and prisoner transportation.  Department Policies, ECF 20-14 to 20-18.  Chief Lawson testified at length about the Department's accreditation, Lawson Dep. at 9:6-13, annual trainings in the use of handcuffs, *id.* at 10:9-24, and the contents of those trainings, *id.* at 11:1-13:5, 14:19-15:9.  Ironically, Plaintiff's expert on police procedures does not opine that the Department lacked policy and training, but rather that Gannon failed to follow it.  ECF 25-6 at 30; Garrels Dep. at 11:3-15.  Even if excessive force were proven, no reasonable jury could find municipal liability on this record.

    2. *Assault and Battery*

Moreover, because Plaintiff cannot establish an excessive force claim, his state law assault and battery claims similarly fail as a matter of law.  *See Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) ("A claim brought under Pennsylvania law for excessive force by a police officer is a claim for assault and battery."); *see also Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) ("[P]olice officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force."); *e.g.*, *Glass v. City of Phila.*, 455 F. Supp. 2d 302, 366 (E.D. Pa. 2006) ("Here, there was no finding of excessive force by the officers; therefore, there can be no claim for liability for assault and battery.").

    3. *Intentional Infliction of Emotional Distress*

Additionally, because Gannon's conduct fell within permissible constitutional bounds, none of his behavior came remotely near the limited kind of egregious police misconduct that could support an IIED claim under Pennsylvania law.  *See, e.g.*, *Sanders v. City of Phila.*, 209 F. Supp. 2d 439, 443 (E.D. Pa. 2002) (granting summary judgment on IIED claim where officer allegedly arrested the plaintiff without probable cause and used too-tight handcuffs); *Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp. 2d 739, 756 (M.D. Pa. 2009) (granting summary

judgment on IIED claim where officer's handcuffing plaintiff and slamming her into the side of a vehicle with great force was insufficiently extreme and outrageous conduct); *Gilbert v. Feld*, 842 F. Supp. 803, 821 (E.D. Pa. 1993) (concluding that officer's arresting plaintiff without probable cause, handcuffing him, making him walk several blocks, transferring him to another jail without instructions to do so, detaining him for several hours before his arraignment, persuading him to waive his arraignment, and signing a false affidavit of probable cause insufficient for IIED claim).

    4. *Official Immunity*

Separately, Gannon is entitled to official immunity as to Plaintiff's state law claims under Pennsylvania's Political Subdivision Tort Claims Act. 42 Pa. Con. Stat. § 8550 (shielding municipal employees from tort liability for acts committed within the scope of their employment except where their conduct amounts to "actual malice or willful misconduct"); *see Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001) ("'Willful misconduct' in this context has the same meaning as the term 'intentional tort.'") (quoting *Delate v. Kolle*, 667 A.2d 1218, 1221 (Pa. Commw. Ct. 1995)). On this record the best Plaintiff could argue is that Gannon made an error of judgment, which falls far short of the "willful misconduct" required to nullify his immunity under Pennsylvania law. *See Sanford v. Stiles*, 456 F.3d 298, 314-15 (3d Cir. 2006).

**IV.**    **Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted. An appropriate order follows.

                                                        /s/ Gerald Austin McHugh
                                                        United States District Judge